UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. S1-4:18 CR 975 CDP (JMB) |
| | ) | |
| CHRISTOPHER MYERS, and | ) | |
| STEVEN KORTE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM, REPORT, AND RECOMMENDATIONS OF MAGISTRATE JUDGE[1]

Currently before the Court are the following pretrial motions filed by co-defendants

Christopher Myers ("Myers") and Steven Korte ("Korte"):

- Myers's Motion to Dismiss Indictment and for a Hearing to Develop an Evidentiary Record (ECF No. 188);

- Korte's Motion to Dismiss for Failure to Preserve Evidence (ECF No. 176);

- Korte's Motion to Sever Defendants (ECF No. 177);

- Korte's Motion to Suppress Statements (ECF No. 178); and

- Korte's Motion to Dismiss Count Three of the Indictment (ECF No. 199).

The government opposes each motion.  (ECF Nos. 189, 203)

## PRODECURAL BACKGROUND

The present case stems for allegations that officers with the St. Louis Metropolitan Police

Department ("SLMPD") beat a fellow officer (referred to as L.H.) who was operating in an

undercover capacity during protests and civil unrest in the City of St. Louis on September 17,

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

2017.  The protests and unrest followed the acquittal of a former SLMPD police officer who had been charged with murder.

A Grand Jury returned the original Indictment in this case on November 29, 2018.  That Indictment charged four defendants, Dustin Boone ("Boone"), Randy Hays ("Hays"), Myers, and Bailey Colletta ("Colletta"), with a variety of offenses.  (ECF No. 1)  Hays and Colletta pleaded guilty and are awaiting sentencing.  On December 12, 2019, the Grand Jury returned a Superseding Indictment against Boone and Myers which added charges against Korte.[2]

Count One of the Superseding Indictment charges Boone, Myers, and Korte with deprivation of L.H.'s civil rights, in violation of 18 U.S.C. § 242.  Count Two charged Myers with destroying evidence, in violation 18 U.S.C. § 1519.  Count Three Korte with making a false statement to the FBI, in violation of 18 U.S.C. § 1001(a)(2).[3]

The Court held two hearings in connection with Korte and Myers's pending motions.  On August 4, 2020, the Court held a hearing concerning subpoenas served by Korte which relate to Korte and Myers's motions to dismiss for failure to preserve evidence.  In general, the August 4th hearing focused on identifying discoverable evidence relating to the operation of a particular real-time crime camera on September 17, 2017.  Eight officers with the SLMPD testified at the August 4th hearing.  (ECF No. 219)

On September 8, 2020, the Court held an evidentiary hearing.  Myers and Korte were present with their attorneys and the government was represented by counsel.  The first part of the September 8th evidentiary hearing focused on the pending motions to dismiss for failure to

---

[2] Boone elected not to file any pretrial motions.  Thus, the only remaining pretrial motions are those filed by Myers and Korte.

[3] Additional procedural background facts are outlined in a prior Memorandum, Report, and Recommendation denying Hays's motion for severance.  (ECF No. 87)

preserve evidence.  Nine officers with the SLMPD testified.  (ECF No. 231)  The second part

focused on Korte's motions to suppress statements and to dismiss Count three.  Special Agent

Darren Boehlje, FBI, testified during the second part of the hearing.  (ECF No. 231).[4]

## FINDINGS OF FACT

As mentioned above, this case involves allegations that SLMPD officers arrested and

assaulted a fellow officer, L.H., who was operating in an undercover capacity during protests and

civil unrest in the City of St. Louis during the evening of September 17, 2017.  The alleged

beating occurred near the corner of Olive and 14th Streets, in downtown St. Louis.

The SLMPD operates a Real Time Crime Center ("RTCC"), which is responsible for

several video cameras located throughout the City of St. Louis.  On the evening of September 17,

2017, one of the RTCC remote-controlled video cameras was located at Olive and 14th Streets.

This is the camera that is relevant to Myers and Korte's motions to dismiss.  The parties provided

the Court with a flash drive with a copy of the video from that camera.  (Def. Exh. 1)  The video

supplied to the Court contains approximately 90 minutes of footage.  That footage shows the

camera moving to capture different aspects of the area visible from the corner of Oliver and 14th

Streets.  The parties agree that the most relevant portions of the video are from about 53:35 to

about 58:15.

For purposes of deciding the instant motions, the undersigned will accept the general

description of the scene, as recounted in Myers's motion.  (ECF No. 188)  Myers's motion

describes the scene as recording the movement of a team of police ("Team 2") as it approached

the corner of Olive and 14th Streets.  In Footnote 4, Myers represents that, "[a]t 53:48, a dark

---

[4] With leave of the Court, Myers and his attorney were excused from participating in the second part of the hearing inasmuch as Myers did not have any remaining issues that required testimony or evidence.

figure appears just a few feet east of the northeast corner of 14th and Olive, between the curb and a large, white mobile generator in the street.  The dark figure is [L.H.]."   And Myers acknowledges that the camera did not record the initial contact between L.H. and any police officers.  Rather, as the team of police officers approaches the corner, the camera pans from the right to the left, focusing north on 14th Street.  During this time, the camera captures other events, including what appears to be a possible arrest, detention, or other official interaction with another person on 14th Street (at about 54:05)  The footage is very grainy and dark; it is not possible for the undersigned to identify any particular individual (L.H. or other police officer).

At about 58:12, the camera pans back to where a person can be observed seated on the curb with a few officers around.  Again, according to Footnote 4 of Myers's motion, the person on the curb is L.H. and Myers is one of the officers near L.H.

The camera does not linger more than a second or two at the corner where L.H. is seated.  Rather, it pans immediately to an opposite corner.  The camera appears to be focusing on a person wearing a mask who was carrying a shield on his left forearm and holding long item in his right hand.[5]  The camera adjusts several times in what appears to be an effort to follow this person as s/he moves.  It appears to the undersigned that the camera followed the person with the shield until s/he moved beyond the camera's line-of-sight.  During this time, at about 59:11, an object slung over the man's right shoulder is visible.  Due to the poor quality of the video, one

---

[5] At the evidentiary hearing, the government characterized the long item as possibly a spear or similar object.  The undersigned reviewed the entire video provided as Defendant's Exhibit 1.  At about 15:00, the video shows a sizable group of people walking down the middle of the street.  At about 17:56, the person holding the shield and object can be seen near the back of that group.  It appears to the undersigned to be the same person based on the mask and unique characteristics of the shield.  The long object in the person's right hand is a flag.  In the later footage, one cannot tell that the object is a flag, but there are large objects on the top and bottom of the pole/object in his right hand.

cannot readily determine whether that item might be a weapon or something else, even with the benefit of being able to review the video several times.

In September 2017, SLMPD Sgt. Ann Long was a supervisor in the RTCC, and had worked in the RTCC for several years.  Sgt. Long testified that the RTCC deploys cameras at various locations.  Some cameras can be manipulated in terms of the pan, tilt, and zoom of the camera.  Sgt. Long's testimony indicated that officers working in the RTCC operate and manipulate the cameras.  Officers who operate the cameras are required to use login credentials to access RTCC camera functions.  (See Def. Exhs. 4-12)  Officers can login while physically within the RTCC space, as well as remotely.

Sergeant Long explained that officers try to "capture as much as you can of the event and then the entire scene and encapsulate everything."  (Tr. at 9)[6]  Sgt. Long further testified that that RTCC officers would want to capture video of an arrest, and also that "especially during protests or riots, some officer safety issues, so [officers would] make sure that they were safe as well with their perimeter."  (Id.)

Regarding the evening of September 17, 2017, Sgt. Long testified that there were "a lot of officer safety issues at the time," so the RTCC would have been looking wider and at the perimeter.  (Tr. at 14)  Sgt. Long explained that the camera at Olive and 14th Streets also captured footage of people running from the police, and that officers in the RTCC look at the perimeter around the officers on the street.

Prior to her testimony, Sgt. Long watched the video footage from the camera at Olive and 14th Streets.  (Def. Exh. 1)  She testified that moving the camera to follow people running was

---

[6] "Tr." refers to the transcript of the September 8, 2020, evidentiary hearing.  (ECF No. 233)

consistent with providing "that extra level of officer safety in that sense that we can follow a wider view than our officers on the ground can see." (Tr. at 14-15)

At least some of the officers in the RTCC knew that L.H. was going to be operating in an undercover capacity in downtown St. Louis.  SLMPD Det. Christopher Gwaltney testified that he was aware of L.H.'s undercover duties on September 17, 2017.  Det. Gwaltney also testified that he was not aware of using the RTCC camera system to monitor undercover officers.  (See Tr. at 29)  Det. Gwaltney testified that he was in contact with L.H. via cell phone texts, and that officers in the RTCC were monitoring livestreams from people in the crowd (including L.H.) on platforms like Facebook.  (See id. at 30)

Detective Gwaltney explained that the volume of cell service being used during the protests made monitoring livestreams "spotty."  (Tr. at 33)  Det. Gwaltney explained that there were "thousands and thousands" of people spread out over a large area.  Officers in the RTCC were "trying to look for … the incidents going on.  Like property damage or people doing things like running over to light a car on fire."  (Tr. at 34)  Consistent with Sgt. Long's testimony, Det. Gwaltney explained that "we were looking for things … so that we could provide intelligence to the [police officers] on the street….  [O]ur role that night was to look for the bad stuff so we could tell our people where the bad stuff was….  Because if someone is walking around with an AR-15 and they go hide behind a dumpster, everyone needs to know."  (Tr. at 34-35)

Prior to the evidentiary hearing, Det. Gwaltney watched the video from the RTCC camera at Olive and 14th Streets.  (Def. Exh. 1)  Det. Gwaltney confirmed that it appeared to capture a person that had something that "look[ed] like it could be used as a weapon."  (Tr. 36)  Det. Gwaltney testified that it was consistent with RTCC's goal to attempt to video people committing crimes, such as property damage, as well as people who may pose a danger to police

officers or others present.  (See Tr. at 36)  Det. Gwaltney also testified that capturing an arrest of a citizen by the police would be the type of information RTCC would try to record.  (See Tr. at 37)

It is not known who operated the camera during the time of L.H.'s arrest.  There are records available as to which officers' login credentials were used on September 17, 2017, (Def. Exhs. 4-12) but there are no records indicating the specific user(s) who operated or manipulated the camera at Olive and 14th Streets.  The officers who testified at the evidentiary hearing could not specifically recall operating that camera.  The undersigned credits that testimony.  Having considered the entire 90 minutes of footage (Def. Exh. 1), the camera is moved several times to capture a variety of events and perspectives.  Furthermore, the movement is generally consistent with the testimony of Sgt. Long and Det. Gwaltney—the camera is moved and captures the perimeter around police activity, as well as persons, such as the man with the shield and long object, who might pose a threat to police.

Sergeant Marcos Silva, who worked in the RTCC in September 2017, testified that the camera at Olive and 14th Streets was manually operated.  (See Tr. at 21)  Thus, someone who was logged into the system moved the camera's focus from the area around L.H. to the perimeter area, as depicted in Defendant's Exh. 1.  The testimony from the evidentiary hearing also established that, even though it may have been theoretically possible to determine which officer actually moved the camera at the time in question, any such logs would not have been maintained beyond 30 days.  The FBI requested specific user information, but the request was well after 30 days had lapsed.  Sgt. Silva testified that he would have been the person who would have pulled the logs to maintain them, had a timely request been made.  (See Tr. at 23-27)  Det. Gwaltney testified that it was "highly likely that [he] operated [the camera at 14th and Olive] at

some point" on September 17, 2017, and that the RTCC had many cameras it was using.  (Tr. at 31)  Det. Gwaltney did not believe, however, that he was operating the camera at 14th and Olive during the time period relevant to L.H.'s arrest.  (Tr. at 32)

In addition to RTCC camera issues, the evidentiary hearing also focused on circumstances associated with Korte's statements to the FBI and government attorneys.  Federal officials interviewed Korte twice.  The first interview occurred on July 25, 2018, and the second occurred on August 8, 2018.

Darren Boehlje is a Special Agent ("SA") with the FBI with about nine years of experience as an agent.  Prior to becoming a Special Agent, he was an Intelligence Analyst with the FBI for about five years.  SA Boehlje was assigned to investigate the police response to the events of September 17, 2017.  In early July 2018, SA Boehlje contacted Korte by telephone. SA Boehlje testified that he advised Korte that he (Korte) had been identified as a potential witness in the L.H. investigation.  SA Boehlje testified that he explained to Korte that some witnesses came in and talked while others would only speak if called before the Grand Jury.  SA Boehlje wanted to speak with Korte on July 26, 2018, and he described Korte as "very cooperative" but that Korte wanted to meet on July 25th due to his personal schedule.  SA Boehlje explained that he understood Korte wanted to meet outside of the Grand Jury.[7]

SA Boehlje arranged to meet Korte on July 25, 2018.  The meeting occurred around 9:00 a.m. and was held in a conference room in the U.S. Attorney's Office, on the 18th Floor of the Thomas F. Eagleton Courthouse.  The conference room had two entry/exit doors.  One door exited to a public space and was unlocked; the other door exited to private space in the U.S.

---

[7] SA Boehlje took notes of his telephone conversations with Korte, which were admitted as exhibits.  (Gov't Exhs. 1, 3, 5)  Also admitted were two of SA Boehlje's official reports, known as FD-302s.  (Gov't Exhs. 4, 6)

Attorney's Office.  Korte arrived on his own—he was not transported by anyone involved in the

investigation.  Korte was not accompanied by a lawyer.  Also present were SA Boehlje, another

FBI Agent, an Assistant U.S. Attorney, and two attorneys from the U.S. Department of Justice.

Korte was not restrained, no voices were raised, neither agent was armed, and no threats or

promises were made.  Korte was not provided any <u>Miranda</u> warnings and he was not told he was

free to leave.  But SA Boehlje testified that Korte was free to leave and did, in fact, leave at the

conclusion of the interview.  During the interview, Korte denied having any interaction with L.H.

on September 17, 2017.  Korte was not served with a subpoena to appear before the Grand Jury

on July 25 or July 26, 2018.  Instead, he was served with a subpoena directing him to appear

before the Grand Jury on August 8, 2018.[8]

SA Boehlje testified that L.H. recorded his September 17, 2017, arrest and assault on his

cell phone.  Sometime after Korte's meeting and interview with SA Boehlje on July 25, 2018,

and before August 8, 2018, two witnesses identified Korte's voice on that recording.  As a result

of that voice identification, SA Boehlje believed that Korte was present during the assault, but he

did not know what role Korte may have played in the events.  (<u>See</u> Tr. at 62, 75)

On August 8, 2018, Korte returned to the U.S. Attorney's Office.  Korte arrived on his

own, and he was interviewed in the same conference room that was used for the July 25th

_____

[8] In his post-hearing brief, Korte argues that there is email evidence between SA Boehlje and prosecutors to show he served a Grand Jury subpoena on Korte before the July 25th meeting. (ECF No. 234 at 3)  This is in contrast with his original motion to suppress, where he acknowledged that he had not been served with a subpoena prior to his July 25th meeting.  (ECF no. 178 at 3)  In any event, SA Boehlje credibly testified that he did not, in fact, serve a subpoena on Korte before the July 25th meeting.  Rather, SA Boehlje had a subpoena in hand for Korte to testify at 11 a.m., on July 26th.  It is not disputed that Korte was not available on July 26th.  SA Boehlje testified that, at the end of the July 25th meeting, he served Korte with a Grand Jury subpoena for August 8, 2018, which was accomplished by crossing out the July 26th date and writing over the former date with the following: "8/8 @ 1pm" (Gov't Exh. 2)  The undersigned finds that Korte was never served with a Grand Jury subpoena for July 25 or July 26, 2018 but was served with a subpoena for August 8, 2018.

interview.  Korte was not accompanied by a lawyer.  Also present were SA Boehlje and the two

attorneys from the U.S. Department of Justice.  Korte was not provided any <u>Miranda</u> warnings

nor was he advised that he was free to leave.  The meeting was brief—Korte listened to the

recording of L.H.'s assault and was asked if his voice was on that recording.  Korte denied that

his voice was on the recording.  Like the prior meeting, no voices were raised, nobody was

armed, Korte was not restrained, and he left at the end of the interview.  Korte was not placed in

front of the Grand Jury to testify on August 8th.

On August 31, 2018, SA Boehlje contacted Korte and asked if he would speak with the

federal investigators again.  Korte advised SA Boehlje that he now had an attorney but would

nonetheless agree to speak with the investigators on September 5, 2018.  That meeting did not

occur.

The first indictment in this case was returned in November 2018.  Korte was not charged

in the first indictment.  The Grand Jury added charges against Korte in the Superseding

Indictment it returned on December 12, 2019.

In addition to testifying about Korte interviews, SA Boehlje also testified that, as part of

his investigation, he contacted a photographer named Lawrence Bryant.  Mr. Bryant took several

high-quality photographs of the area where L.H. was assaulted.  Mr. Bryant provided those

photographs to SA Boehlje.  In his motion, Myers explains how defense counsel also obtained

copies of the Lawrence Bryant photographs.  (ECF No. 188 at 3 n.6)  Myers's motion explains

that the Lawrence Bryant photographs "capture much, but not all, of the events surrounding"

L.H.'s arrest.  (<u>Id.</u>at 3)  More specifically, there are more than 400 photographs, and at least 102

of those photographs capture events surrounding L.H.'s arrest.  (<u>Id.</u> at 3 n.6)

-10-

The Lawrence Bryant photographs were provided to the undersigned but not formally admitted into the record of the evidentiary hearing.  After the evidentiary hearing, the undersigned contacted the lawyers for Myers, Korte, and the government who all agreed that the Court could and should consider those photographs in addressing the pending motions. Accordingly, the undersigned will refer to those photographs as Government's Exhibit 7.

Additional findings of fact are included in the discussion below.

## DISCUSSION

**I.**    **Motion to Dismiss for Failure to Preserve Evidence** – (Myers and Korte)

**A.**    **Summary of Arguments**

Both Myers and Korte ask the Court to dismiss the charges against them due to alleged due process violations.  Both defendants argue that the SLMPD failed to record and preserve RTCC video surveillance evidence that would have captured the events associated with L.H.'s arrest on September 17, 2017.  Both Defendants argue that the RTTC camera was moved manually, in bad faith.  Korte contends that the testimony of the officers at the evidentiary hearing is not credible.  In his post-hearing memorandum, Korte argues that –

> The camera was manipulated by someone in the RTCC on the night of L.H.'s arrest, and the officer who moved the camera would have known by the next day that an incident occurred near 14th and Olive.  At that time, the relevance of the surveillance footage would have been obvious.  If the officer who was operating that camera had a reason to move the camera from the arrest, other than to conceal evidence of the arrest, the officer would have recognized the significance of that fact and admitted to doing so during the investigation or at the [evidentiary] hearing.

(ECF No. 234 at ¶ 6)  Korte contends that that how an "arrestee has been treated and/or whether they've been physically manhandled without provocation" is extremely relevant.  (Tr. at 79) Korte further argues that the officer who moved the camera failed to follow instructions and obligations to record incidents, such as L.H.'s arrest, "from start to finish."  (Id.)  Similarly,

Myers argues that the RTCC's standard practices is to capture an entire event (e.g., arrest) from start to finish.  "Correspondingly, the failure to preserve or collect evidence in contravention of standard practice evidences [bad faith]."  (ECF No. 188 at 4)

The government counters that Myers and Korte have not met their burden with regard to either the exculpatory nature of the evidence or bad faith.  As for the nature of the potential video evidence, the government argues that the defendants have failed to demonstrate that the video would been exculpatory because the quality is so poor that, even if the RTCC had recorded L.H.'s arrest, identification of specific officers would have been unlikely.  Relatedly, the government argues that the defense was provided with better evidence—dozens of high-quality photographs taken of the events in question.

The government also asks the Court to note that this is not a case in which potentially useful evidence was destroyed, but rather a situation in which evidence was never created or collected.  It is not disputed that the RTCC camera at Olive and 14th Streets did not capture L.H.'s arrest because it was pointed at another area of interest.  The government contends that Trombetta and subsequent cases do not impose a duty to obtain evidence.  Quoting Miller v. Vasquez, 868 F.2d 1116, 1120 (9th Cir. 1988), the government argues, "[s]ince, in the absence of bad faith, the police's failure to preserve evidence that is only potentially exculpatory does not violate due process, then a fortiori neither does the good faith failure to collect evidence violate due process."

**B.**      **Relevant Legal Principles**

Due Process affords criminal defendants a meaningful opportunity to present a complete defense and requires the government to preserve exculpatory evidence.  This rule is most famously reflected in Brady v. Maryland, 373 U.S. 83 (1963), which addressed suppressing

exculpatory evidence.  But the government's obligations regarding evidence whose value is unknown or merely "potentially useful" to a defendant are not necessarily as demanding as the obligations imposed by Brady.  See California v. Trombetta, 467 U.S. 479, 485 (1984); Arizona v. Youngblood, 488 U.S. 51, 57 (1988).

In Trombetta, the Supreme Court began to address the issue of the destruction of (or failure to preserve) potentially useful evidence.  Trombetta involved the destruction of breath samples from an "Intoxilyzer" device used to detect drunk drivers.  See 467 U.S. at 481.  The Court reasoned that, even assuming that the breath samples might be exculpatory relative to the operation of the Intoxilyzer, the defendants had other means of demonstrating their innocence. As such, the Court held that Due Process did not require law enforcement to preserve breath samples.  See id. at 490.

In Arizona v. Youngblood, the Court clarified the standard a defendant must satisfy to make out a Due Process violation when the government destroys or fails to preserve evidence the value of which is not certain and only potentially useful to a defendant.  See 488 U.S. at 57-58. The defendant in Youngblood was charged with a child sexual assault and law enforcement failed to preserve semen samples from the victim.  Id. at 52.  The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  Id. at 58.  Concluding that the government's conduct was negligent at worst, the Court found no Due Process violation.  Id.

More recently, the Eighth Circuit has explained that "[t]he general rule is that '[l]aw enforcement's failure to preserve potentially exculpatory evidence violates due process if the defendant can show that that [it] acted in bad faith.'"  United States v. Paris, 954 F.3d 1069, 1074 (8th Cir. 2020) (quoting United States v. LeBeau, 867 F.3d 960, 976-77 (8th Cir. 2017)).

"Additionally, the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  Id. (cleaned up ) (quoting LeBeau, 867 F.3d at 977)).  The Eighth Circuit has also explained that, "'[i]f … the evidence is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of the police to make out a due process violation.'"  United States v. Bugh, 701 F.3d 888, 894 (8th Cir. 2012)   (quoting United States v. Houston, 548 F.3d 1151, 1155 (8th Cir. 2008)).  "The burden is on the defendant to demonstrate that the evidence was destroyed in bad faith, … and negligent destruction of evidence is insufficient to establish a due process claim …."  Id. (citations omitted).

### C.   Analysis

Applying the foregoing principles to the available facts, the undersigned finds that Myers and Korte have not carried their burden of showing a due process violation occurred such that the charges against them should be dismissed.

First, even assuming, arguendo, that the video would have captured useful and potentially exculpatory evidence, on the record before the Court, the undersigned finds that there has been no showing of bad faith.  See Paris, 954 F.3d at 1074.  In this regard, the undersigned credits the testimony of the various officers that they do not recall specifically moving the camera at Olive and 14th Streets, at the time in question.  The events unfolding during the evening of September 17, 2017, occurred during a period of extended civil unrest.  Such events were unpredictable and chaotic and had the potential for danger.

Additionally, Defendants' arguments that that the officers in the RTCC did not follow proper training or procedures because they did not record L.H.'s arrest from "start to finish" is

not consistent with the testimony adduced at the hearing.  To the contrary, the testimony of Sgt. Long and Det. Gwaltney, which the undersigned credits, established that RTCC cameras were also used to provide situation awareness information to the officers out amongst the crowds. This information included information regarding crowd movement and activity around the perimeter.  The RTCC provided that type of information for officer safety purposes.  The video provided to the Court shows the camera being moved to capture various events and scenes, and was generally consistent with Det. Gwaltney's testimony that "our role that night was to look for the bad stuff so we could tell our people where the bad stuff was."  (Tr. at 34-35; emphasis supplied)

In this particular case, the camera located at Olive and 14th Streets captures a team of officers moving into the area where L.H. was arrested.  According to Myers's motion, L.H. appears briefly in the foreground of the recording.  As noted in the findings of fact above, the undersigned cannot make out any specific individual in that footage.  In any event, even before any contact between the officers and L.H., the camera pans to what appears to be just north of the intersection of Olive and 14th Streets and captures a possible arrest or detention and other officers moving up 14th Street.  The camera at this time is positioned to monitor a perimeter around the area, which is consistent with testimony from the evidentiary hearing.  Several minutes later, the camera pans back for about a second where a man (reportedly L.H.) is seated on the curb and surrounded by a few officers.  The camera almost immediately pans to captured video of a person on an opposite corner who was wearing a mask and carrying a shield and a long object.  As discussed above, the long object was most likely a flag, although that conclusion is based on the undersigned observing the same person much earlier in the footage.  The person also had an elongated object (or objects) slung over his/her shoulder.  The camera followed this

-15-

person until the person was no longer within view.  This is consistent with witness testimony that RTCC cameras would be used to identify persons who might hide or pose a threat to officer safety.

Having reviewed the video footage, the undersigned cannot say that a decision to move the camera's focus on these facts amounts to bad faith.[9]  It is not disputed that the camera moved before officers engaged L.H., not during the arrest.[10]  One can speculate why the camera was moved, but such speculation does not amount to a showing of bad faith in this case, especially in light of the dynamic nature of the events occurring on September 17, 2017.  Furthermore, when the camera did clearly capture the person on the curb (reportedly L.H.), it did not linger.  Rather, it panned to capture a person who could have been armed and posed a danger to the police.

The undersigned also finds that Myers and Korte have not shown that the evidence not captured due to moving the camera would have been exculpatory or potentially useful, or better than comparable evidence that is readily available to Defendants.  Having reviewed the video in question, the government correctly describes the quality as poor and making it unlikely that the video itself would have significant value relative to comparable evidence that is available by other means.  See Paris, 954 F.3d at 976-77.  In particular, Myers and Korte obtained numerous, high resolution photographs that capture the scene in question.  (See Gov't Exh. 7)  Those

---

[9] The undersigned also finds that, after a federal investigation of the matter had begun, the government made a reasonable effort to obtain the RTCC video as well as identify the person who operated the camera at the time in question.  Based on the testimony and evidenced adduced at the evidentiary hearing, the undersigned finds that any information regarding the operator was not preserved due to normal operating procedures—such information was only maintained for 30 days or so.  There was no request for the information until a much later time.  Thus, there was no bad faith on the part of the RTCC officers in failing to maintain additional information about who may have moved the camera.

[10] Because the camera did not capture the beginning of the encounter and arrest, one cannot fairly say that the camera operator failed to follow procedures by failing to capture L.H.'s arrest "from start to finish."

photographs cover the police team arriving at the corner up through the point at which L.H. is on the curb.  Also, the record indicates that the photographer was necessarily a witness to the events in question.  The photographer's identity is known to Defendants.

In summary, the undersigned finds that Myers and Korte have not carried their burden of showing a due process violation due to a failure to video record L.H.'s arrest.  To the contrary, and even assuming that a failure to create evidence (as opposed to a failure to preserve evidence or a destruction of evidence) should be analyzed under the Trombetta rubric, the testimony and evidence before the Court indicates that the value of the video footage was poor quality and there exists other photographic evidence of the scene in question.  Most significantly, the undersigned finds that Myers and Korte failed to show that any officer acted in bad faith in moving the camera at Olive and 14th Street from the scene of L.H.'s arrest to focus on other relevant locations and activity occurring in the same area.

**II.**     **Motion to Suppress Statements** – (Korte Only)

Korte was interviewed by SA Boehlje and government lawyers on July 25, 2018, and August 8, 2018.  Korte contends that any statements he made in those interviews should be suppressed because the government misused the Grand Jury process to interview him.  The government counters that it did not misuse any process and that Korte was never in custody, was not entitled to any Miranda warnings, and any statements he made were voluntary.

**A.**     **Relevant Legal Principles**

Statements made to law enforcement officers during custodial interrogation are normally subject to the protections and procedures identified in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966).  See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  "Custodial interrogation means questioning initiated by law enforcement officers after a person has been

taken into custody …." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citation and quotation omitted). Miranda warnings are required when a suspect is both in custody and subjected to official questioning. See LeBrun, 363 F.3d at 720. In this case, it is not disputed that Korte was subjected to official questioning and he was not provided Miranda warnings. Therefore, the critical issue the Court must resolve is whether Korte was in custody or otherwise improperly compelled to be present on July 25 or August 8, 2017, when he was questioned at the U.S. Attorney's Office.

"The ultimate question in determining whether a person is in 'custody' for purposes of Miranda is whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." United States v. Giboney, 863 F.3d 1022, 1027 (8th Cir.) (citation and quotations omitted), cert. denied, 138 S. Ct. 527 (2017). This determination is made using an objective standard. Id. Thus, the "'relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation.'" Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). This inquiry is guided by the so-called Griffin factors, which focus on six, non-exclusive considerations. See United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990). The Griffin factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Zavesky, 839 F.3d 688, 696 (8th Cir. 2016) (quoting Griffin, 922 F.2d at 1349), cert. denied, 137 S. Ct. 1388 (2017).

Korte's motion to suppress rests largely on his contention that any statements he made were in response to being subpoenaed to testify before the Grand Jury.  (See, e.g., ECF No. 178 at 6)  Citing In re Melvin, 546 F.2d 1 (1st Cir. 1977) and United States v. Wadlington, 233 F.3d 1067 (8th Cir. 2000), Korte contends that any statements he made on July 25 and August 8, 2018, should be suppressed because the government misused a Grand Jury subpoena to compel his presence for private, ex parte interviews.

**B.**     **Analysis**

Korte places too much reliance on In re Melvin and Wadlington.  While both of those cases address misuse of the Grand Jury process, they are factually distinguishable from the instant case.  In In re Melvin, the government relied on an earlier-issued subpoena for photographs and fingerprints to compel a suspect in an armed bank robbery to appear in a line-up, purportedly for the benefit of a grand jury.  The First Circuit held that a new subpoena was required.

Wadlington is also distinguishable.  In that case, the Eighth Circuit acknowledged that the government may not use Grand Jury subpoenas to secure private interviews of potential witnesses.  See Wadlington, 233 F.3d at 1075.  But the Court's opinion also recognized the government's authority to speak with witnesses in advance of any Grand Jury testimony.  See id. (citing United States v. Universal Mfg. co, , 525 F.2d 808, 811-12 (8th Cir. 1975); In re Possible Violations of 18 U.S.C. §§ 201, 371, 491 F.Supp. 211, 213 (D.D.C. 1980)).  Thus, the government may privately interview Grand Jury witnesses but may not use a Grand Jury subpoena to compel such an interview.

The undersigned finds that the government did not misuse the Grand Jury process to compel Korte to participate in a private interview.  Regarding the first meeting, SA Boehlje

credibly testified that he contacted Korte by telephone and advised Korte that he was a potential

witness to the L.H. matter.  SA Boehlje further credibly testified that he explained to Korte that

some people would only speak in the Grand Jury while others had agreed to "just sit down and

talk with us."  (Tr. at 56-57)  In fact, it was Korte, not Boehlje, who selected the date of the first

meeting; Korte was not served with a subpoena in advance of the July 25, 2018, meeting.  Thus,

the government did not misuse the Grand Jury process to trick or coerce Korte, an experienced

law enforcement officer, into meeting with government investigators and lawyers on July 25,

2018.

At the conclusion of the July 25, 2018, meeting, SA Boehlje served Korte with a

subpoena to appear before the Grand Jury on August 8, 2018.  It is not disputed that Korte did

not testify before the Grand Jury on August 8th.  Rather, he was briefly interviewed in the U.S.

Attorney's Office regarding the question of whether his voice could be heard on a recording of

L.H.'s arrest.

SA Boehlje testified that, after the July 25th meeting, Korte's voice was identified on a

recording of L.H.'s arrest.  SA Boehlje credibly testified that, on August 8, 2018, the

investigators asked Korte if they could play a portion of the recording for him "prior to him

going in the grand jury."  (Tr. at 63)  Korte acquiesced, and SA Boehlje testified that the

interview was very short and that Korte denied that his voice was on the recording and that he

did not recognize any other voices.  Government's Exhibit 4 is a summary report of the August

8th interview.

On these facts, the undersigned finds that the government did not misuse the Grand Jury

process to secure an involuntary interview on August 8th.  After SA Boehlje had served Korte

with the Grand Jury subpoena, the investigation team learned that witnesses had identified

Korte's voice on a recording of the L.H. arrest.  Thus, it would be acceptable, even under the analysis of Wadlington, for government investigators to briefly question Korte about this new information before placing him before the Grand Jury.  Furthermore, because Korte denied that his voice was on the recording, it would reasonable not to place him before the Grand Jury without further investigation.  In this regard, SA Boehlje testified that it was his belief that Korte was present at L.H.'s arrest, but that he did not know what role Korte may have played in that arrest and relevant events, and that the investigators "couldn't figure out why [Korte] was saying it wasn't him when it appeared to be him on the audio."  (See Tr. at 75, 76)  The undersigned finds that, although Korte was served with a Grand Jury subpoena for August 8, 2018, that process was not abused by the government to secure an interview regarding the voice recording.

Finally, the remaining facts and circumstances associated with the July 25th and August 8th meetings lead to a strong conclusion that Korte was not in custody on either date.  See Giboney, 863 F.3d at 1027; Zavesky, 839 F.3d at 696.  As discussed above, Korte selected the date of the meeting first meeting.  Korte arrived at both meetings on his own and he was never restrained.  He was not mistreated, there were no weapons drawn, and no voices were raised. Korte was free to leave and did, in fact, leave at the conclusion of each interview.  Furthermore, Korte was an experienced law enforcement officer and most likely well aware of his rights. Because he was not in custody, Korte was not entitled to any Miranda warnings prior to being interviewed on July 25 or August 8, 2018.

For the foregoing reasons, the undersigned respectfully recommends that the Court deny Korte's motion to suppress statements.

III.   **Motion to Sever Trials** – (Korte Only)

Korte also asks the Court to sever his trial from the trial of any co-defendant, pursuant to Fed. R. Crim. P. 14.[11]  Korte's severance motion focuses on three concerns.  First, Korte notes that the evidence against some co-defendants is likely to include inflammatory text messages. Korte argues that those text messages do not involve or implicate him.  Korte contends that some of these text messages are not only inflammatory, but also inculpatory as to other co-defendants, but not to him.  Thus, Korte argues that there is a risk of prejudicial spillover because a jury cannot compartmentalize this type of inflammatory evidence.  Similarly, he argues that "the text messages are particularly problematic in light of the disparity of the weight of the evidence against each defendant," contending that the case against him rests mostly on the identification of his voice on a recording of L.H.'s arrest.  In other words, Korte argues that he faces the risk of conviction based on evidence that would not be admissible against him if he is tried separately.

Second, Korte argues that severance is necessary due to serious hearsay and Sixth Amendment concerns.  Regarding text messages, Korte notes that some of the text messages may be admissible against one or more co-defendants, but not him, pursuant to Fed. R. Evid. 801(d)(2)(A), and that those texts would not be admissible against him as co-conspirator statements, pursuant to Fed. R. 801(d)(2)(E), because there is no conspiracy that would have been furthered by any known text messages.  Relatedly, Korte raises Confrontation Clause concerns, such as those addressed in Bruton v. United States, 391 U.S. 123 (1968).

Finally, Korte argues that there is a risk that some co-defendants may testify while others will not.  Citing DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), Korte contends that, if a

---

[11] The parties agree that the defendants and counts in the Superseding Indictment are properly joined, pursuant to Fed. R. Crim. P. 8.

co-defendant testifies, that co-defendant's attorney may be obligated to comment on Korte's

failure to testify, if that were to be Korte's choice, thereby depriving Korte of a fair trial.

The government counters that this is not the type of rare case in which severance is

warranted.  Rather, this is the type of case in which the general preference for joint trials

outweighs the risk of prejudice.  The government suggests that the evidence against each

particular defendant can be readily compartmentalized by the jury, particularly if the jury is

properly instructed.  Finally, the government argues that Korte has identified only speculative

harm flowing from the possibility that a co-defendant may opt to testify at trial.

### A.      Spillover and Compartmentalization Concerns

Even when multiple defendants are properly joined, a district court may, in its discretion,

sever the trial of jointly indicted defendants pursuant to Fed. R. Crim. P. 14(a).  Under Rule

14(a) –

> If the joinder of offenses or defendants in an indictment … appears to prejudice a
> defendant …, the court may order separate trials of counts, sever the defendants'
> trials, or provide any other relief that justice requires.

Severance of defendants is not lightly granted.  "There is a preference in the federal

system for joint trials of defendants who are indicted together."  Zafiro v. United States, 506 U.S.

534, 537 (1993).  See also United States v. Lane, 474 U.S. 438, 449 (1986) (explaining that joint

trials also conserve resources and reduce inconveniences).  "When [as here] defendants are

properly joined, there is a strong presumption for their joint trial, as it gives the jury the best

perspective on all of the evidence and therefore increases the likelihood of a correct outcome."

United States v. Casteel, 663 F.3d 1013, 1019 (8th Cir. 2011) (quoting United States v. Lewis,

557 F.3d 601, 609 (8th Cir. 2009)).

-23-

"It has long been the rule that severance is warranted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"  United States v. Ali, 799 F.3d 1008, 1023 (8th Cir. 2015) (quoting Zafiro, 506 U.S. at 539).  Thus, "[a] court will permit severance only 'upon a showing of real prejudice to an individual defendant.'"  United States v. Payton, 636 F.3d 1027, 1037 (8th Cir.) (quoting United States v. Sandstrom, 594 F.3d 634, 644 (8th Cir. 2010)), cert. denied, 565 U.S. 922 (2011).  See also Casteel, 663 F.3d at 1018 (explaining that the presumption favoring joint trials "'can only be overcome if the prejudice is severe or compelling'") (quoting Lewis, 557 F.3d at 609).  "The defendant carries a heavy burden in making this showing."  United States v. Swinney, 970 F.2d 494, 500 (8th Cir. 1992); see also Sandstrom, 595 F.3d at 644 (quoting same).

When assessing severance issues in the pretrial context, the Court must often make predictive assessments without the benefit of knowing the full and actual evidence against any co-defendant.  For purposes of deciding Korte's motion to sever, the undersigned will accept as true that all of the text message evidence and other inflammatory statements do not involve or mention Korte.  The undersigned will also accept Korte's contention that the government has more evidence against his co-defendants.  But even with those assumptions, Korte is not arguing that a joint trial would compromise a specific trial right.  Rather, he is arguing that the text message evidence and evidence against his co-defendants will prejudice him and prevent the jury from making a reliable determination of his guilt or innocence.

The possibility for prejudice, however, is not enough—even in a unique case such as this matter.  Korte does not show sufficient prejudice warranting severance simply because he would have a better chance of an acquittal if tried separately.  See Zafiro, 506 U.S. at 540 ("[I]t is well

-24-

settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."); see also Sandstrom, 594 F.3d at 644.  Likewise, "[t]he mere fact that evidence is admitted as to one defendant that would not be admissible as to [another defendant] does not constitute prejudice" necessarily requiring severance.  United States v. McDougal, 137 F.3d 547 (8th Cir. 1998) (citing United States v. Helmel, 769 F.2d 1306, 1322 (8th Cir. 1985)).  Rather, "'[t]he Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions ….'" Casteel, 663 F.3d at 1019 (quoting United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996)).  The Eighth Circuit has developed instructions for just this situation.  See, e.g., Eighth Circuit Model Criminal Jury Instruction Nos. 2.14 (evidence admitted against only one co-defendant), 2.15 (statement of one co-defendant not to be used against another co-defendant), and 3.08 (requirement to give separate consideration to evidence regarding each co-defendant) (2014).

Having reviewed the available record, the undersigned finds that the charges and proffered prejudicial evidence are not "so complicated that concerns about the jury's ability to follow [proper] instructions [might] arise." Ali, 799 F.3d at 1024.  Accordingly, even accepting Korte's premise that none of the inflammatory text message evidence or co-defendants' statements would not be admissible if he were tried separately, any risk of prejudice can be adequately addressed with appropriate jury instructions.  See Sandstrom, 594 F.3d at 645 (explaining that "even if a risk of prejudice existed, 'it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions'") (quoting Zafiro, 506 U.S. at 540).  Accordingly, Korte has not carried his "heavy burden" to overcome the presumption favoring joint trials.  Swinney, 970 F.2d at 500.

### B.      Bruton Concerns

In Bruton v. United States, the Supreme Court addressed the potential collision between joint defendants' Sixth Amendment right of confrontation, and their Fifth Amendment right not to be made witnesses against themselves.  See United States v. Ortiz, 315 F.3d 873, 899 (8th Cir. 2002).  "In Bruton, the Supreme Court held that 'a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.'" Ali, 799 F.3d at 1024-25 (quoting Richardson v. Marsh, 481 U.S. 200, 201-02 (1987)).  The Bruton rule does not apply if the codefendant's confession does not incriminate the defendant directly or when considered in view of other evidence in the case.  Id. at 1025 (citation omitted).  "Moreover, 'the Supreme Court cases have held that Bruton is not violated if the non-testifying defendant's statement only inculpates a codefendant inferentially—through linkage to other evidence.'"  Id. (quoting United States v. Coleman, 349 F.3d 1077, 1085 (8th Cir. 2003)).  See also Richardson, 481 U.S. at 208.  The Supreme Court has also made clear that potential Bruton issues "may be avoided through redaction if a cautionary jury instruction is given, if the redactions are neutral, and if they do not obviously directly refer to the defendant."  Coleman, 349 F.3d at 1085 (citing Gray v. Maryland, 523 U.S. 185, 196 (1998)).

Korte offers a specific instance in which the discovery points to a potential Bruton issue.  According to Korte, the discovery provided to him includes Grand Jury testimony from an Officer named Maritnous Walls, III.  Officer Walls's testimony references statements that Myers allegedly made.  According to Officer Walls's testimony, Myers stated that he saw Korte and another officer hit L.H.  Officer Walls's testimony also indicates that Myers expressed

frustration that other officers' names were not brought up in connection with L.H.  Officer Walls testified that he thought maybe Myers was referring to Korte.  (See ECF No. 177 at 5)

The government does not fully address Korte's Bruton arguments.  Rather, the government argues that Myers's statements to Officer Walls was not a confession, "but rather a representation by … Myers to another SLMPD officer that Myers was not the only officer involved in the assault" on L.H.  (ECF No. 189 at 16)

The government correctly notes that Myers's alleged statements to Officer Walls are not akin to a confession.  Nonetheless, Myers's statements could be admissible against Myers because, if true, they would place Myers at the scene of L.H.'s arrest and support the government's theory that L.H. was assaulted by SLMPD officers when Myers was present.  But even if admitted, those statements could be readily redacted to neutralize any reference to Korte.  Korte's motion to sever should be denied to the extent it rests on the potential Bruton issue raised in his motion.

### C.    Adverse Inference and Failure to Testify Concerns

For his final argument in support of severance, Korte asks the Court to consider the possibility that a co-defendant might elect to testify at trial and Korte might not.  Citing DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), Korte contends that counsel for a testifying co-defendant may be obligated to comment on Korte's failure to testify, thereby depriving Korte of the fullness of his Fifth Amendment rights.  The government contends that any such risk is speculative at this time.

DeLuna involved a trial of two co-defendants charged with narcotics offenses.  One defendant testified while the other did not.  In argument, counsel for the testifying co-defendant

made prejudicial comments regarding the non-testifying co-defendant's failure to testify.  On those facts, the Fifth Circuit held that,

> [i]n a criminal trial in federal court an accused has a constitutionally guaranteed right of silence free from prejudicial comments, even when they come only from a co-defendant's attorney.  If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately.

DeLuna, 308 F.2d at 141.

DeLuna was decided on the basis of a post-trial record.  That makes sense because it is often the case that the circumstances requiring severance cannot be determined until at or near trial.  Cf. United States v. McGuire, 827 F.Supp. 596 (W.D. Mo. 1993) (discussing a motion to sever counts).  On the present record, Korte's Fifth Amendment concerns rest on speculation.  It is not known for certain who will go to trial, who will testify, and whether counsel for any testifying co-defendant will have a duty to comment on Korte's failure to testify (should Korte decide not to testify).  Furthermore, it is not clear that any comment would require severance. See United States v. Metz, 625 F.2d 775, 777 (8th Cir. 1980) (rejecting application of DeLuna where an attorney did not directly reference a co-defendant's decision not to testify); see also United States v. Golding, 2018 WL 2690110 at *15 (E.D. Mo. June 5, 2018) (discussing Metz and recommending the denial of a severance motion on the basis of potential DeLuna concerns).  Thus, the undersigned recommends that Korte's motion to sever his trial be denied on the basis of potential DeLuna issues.

**D.   Conclusions – Motion to Sever Trials**

In summary, the undersigned recommends that the Court deny Korte's motion to sever his trial from that of co-defendants Boone and Myers.  The risk of spillover evidence can be addressed with standard jury instructions.  Risks associated with hearsay or Bruton issues can be

managed to avoid prejudicing Korte's trial rights.  And any "DeLuna risk" is entirely speculative at this time.

IV.   **Motion to Dismiss Count Three of the Superseding Indictment** – (Korte Only)

Korte asks the Court to dismiss Count Three for failure to state a claim.  Count Three charges Korte with making three false statements to the FBI when he was interviewed on July 25, 2018, and August 8, 2018.  Korte argues that the statements at issue were not material because they did not have any tendency to influence any agency investigation.  Korte argues that the purpose of the August 8, 2018, interview was not investigatory because federal investigators already believed Korte was involved in L.H.'s arrest and that Korte's voice was on the recording of that arrest.  Korte argues that, although he was subpoenaed to appear before the Grand Jury on August 8th, he was only interviewed—he was never asked to testify before the Grand Jury. According to Korte, the August 8th interview was conducted "solely to attempt to induce [Korte] to make a false statement to support a 18 U.S.C. §1001 charge—the interview served no other purpose."  (ECF No. 199 at 5)[12]  Korte's motion to dismiss Count Three does not meaningfully address any false statements he allegedly made during the July 25, 2018, interview.

The government counters that Count Three tracks the relevant language of the charging statute, 18 U.S.C. § 1001, and includes all of the elements of the offense.  The government argues that materiality is a jury issue that cannot be determined before trial.

---

[12] In a footnote, Korte references the Department of Justice's position in the prosecution of former National Security Advisory, General Michael Flynn.  Korte argues that, in Flynn's case, the government moved to dismiss a false statement charge, post-guilty plea, because the government concluded that the interview in question lacked a legitimate investigative basis and, therefore, any statements made were not material.  (ECF No. 199 at 5 n.1; citing United States v. Flynn, 2020 WL 2213634 (D.D.C.))  The government counters that the situation in Flynn is distinguishable because it involved a motion by the government, concerning prosecutorial discretion.  The Flynn matter remains pending and, in any event, the circumstances in that case do not reflect binding or persuasive precedent that the undersigned is willing to consider in this matter.

A.    **Relevant Legal Principles**

"An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." United States v. Steffan, 687 F.3d 1104, 1109 (8th Cir. 2012) (citations and quotations omitted); see also Hamling v. United States, 418 U.S. 87, 117 (1974). "Furthermore, '[a]n indictment is normally sufficient if its language tracks the statutory language." United States v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009) (quoting United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008)).

Count Three charges a violation of 18 U.S.C. § 1001.  That section

prohibits an individual from "knowingly and willfully … mak[ing] any materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of the federal government.  "[I]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing the decision of the decision making body to which it was addressed."

United States v. Robinson, 809 F.3d 991, 999 (8th Cir. 2016) (quoting United States v. Robertson, 324 F.3d 1028, 1030 (8th Cir. 2003)).  The Eighth Circuit has also made clear that the government does not have to "prove that it actually relied on the false statement for it to have been material." Id. (citing United States v. Mitchell, 388 F.3d 1139, 1143 (8th Cir. 2004)).  "A false statement can be material even if the agent to whom it is made knows that it is false." United States v. Whitaker, 848 F.2d 914, 916 (8th Cir. 1988); see also United States v. Evers, 720 Fed.Appx 322, 323 (8th Cir. 2018) (per curiam) (quoting Whitaker).

In United States v. Gaudin, 515 U.S. 506, 523 (1995), the Supreme Court held that "the question of materiality must be submitted to the jury." United States v. Ferro, 252 F.3d 954, 967 (8th Cir. 2001).  Therefore, "[a]fter Gaudin, … so long as the indictment contains a facially

-30-

sufficient allegation of materiality, federal criminal procedure does not 'provide for a pre-trial determination of sufficiency of the evidence.'" Id. (quoting United States v. Critzer, 951 F.2d 306, 307-08 (11th Cir. 1992)).

**B.    Analysis**

Applying the forgoing principles, the undersigned finds that Count Three tracks the statutory language and facially addresses the elements of a violation of § 1001.  Thus, Count Three is legally sufficient on its face, in view of the standards required by Hamling, 418 U.S. at 117, Steffan, 687 F.3d at 1109, and similar precedent.

Korte's specific arguments about materiality cannot be sustained for at least two reasons. First, the cases he relies upon all predate Gaudin.  Before Gaudin, materiality was a legal question which could be determined pretrial by a district court.  See Ferro, 252 F.3d at 967-68 (explaining that, before Gaudin, the Eighth Circuit "considered materiality to be an issue of law").  After Gaudin, "a facially sufficient allegation of materiality" is an issue for the jury.  Id. Korte has not offered a valid, lawful basis for the Court to usurp the jury's function of determining all of the elements of the offense charged.  Therefore, Korte's motion to dismiss Count Three asks the Court to determine an issue it cannot decide at this time.

Second, Korte's primary factual arguments are not persuasive.  Korte focuses almost entirely on the allegedly false statement he made to SA Boehlje on August 8, 2018—that his voice was not on the recording of L.H.'s arrest.  Korte does not address the other alleged false statements charged in Count Three.  Furthermore, a jury considering all of the facts and evidence could find the statement regarding Korte's voice to be at least capable of influencing an official decision.  See Robinson, 809 F.3d at 1000.  Moreover, timing is relevant here because nobody had been indicted as of August 8, 2018.  Rather, the first indictment in this matter was returned

-31-

on November 29, 2018, and Korte was not charged until December 2019.  Finally, it does not matter that SA Boehlje, or any other investigator, knew or believed Korte was lying about his voice.  See Whitaker, 848 F.2d at 916.  Korte's alleged false statement had at least the potential to influence official action.

Based on the foregoing, the undersigned respectfully recommends that the Court deny Korte's Motion to Dismiss Count Three.

### **RECOMMENDATIONS**

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Myers's Motion to Dismiss Indictment [ECF No. 188] be **DENIED**.[13]

**IT IS FURTHER RECOMMENDED** that Defendant Korte's Motion to Dismiss for Failure to Preserve Evidence [ECF No. 176] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Korte's Motion to Sever Defendants [ECF No. 177] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Korte's Motion to Suppress Statements [ECF No. 178] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Korte's Motion Dismiss Count Three of the Indictment [ECF No. 199] be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Memorandum, Order, and Recommendations, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the

---

[13] To the extent Myers's motion requested an evidentiary hearing, that portion of the motion was previously granted.  (ECF No. 229)

right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); see also

28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

The trial of this matter has been set for March 15, 2021, at 8:30 a.m. before the

Honorable Catherine D. Perry, Senior United States District Judge.  (ECF No. 212)

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  5th   day of  November , 2020

-33-